**LEGUILLON, Appellee,**

v.

**LEGUILLON, Appellant.**

[Cite as *Leguillon v. Leguillon* (1998), 124 Ohio App.3d 757.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

No. CA97–05–053.

Decided Jan. 12, 1998.

*Joseph Candito & Associates* and *Joseph Candito,* for appellee.

*Morgenstern & Gates Co., L.P.A.* and *Roger S. Gates,* for appellant.

---

WILLIAM W. YOUNG, Presiding Judge.

Defendant-appellant Mark Leguillon appeals the Clermont County Common Pleas Court judgment refusing to modify his child support obligation in regard to Penni Leguillon. Mr. Leguillon argues that the trial court abused its discretion in refusing to modify his support obligation despite clear and convincing evidence that he is not the child's biological father.

Mark and Patricia Leguillon were married in November 1979. On February 1, 1993, Mrs. Leguillon filed a complaint for divorce. She named as the parties' children Mark Paul Leguillon, Jr., born March 29, 1981, and Penni, born November 30, 1987.[1] Mr. Leguillon acknowledged both children in the parties' separation and shared-parenting agreements, and the final decree provided that both children were born as issue of the marriage.

Mr. Leguillon had a vasectomy before Penni's birth. When Penni was born in 1987, Mr. Leguillon claimed that he did not question his biological relationship with the child because he believed his vasectomy "had come undone." Two years after the divorce, however, Mr. Leguillon had a sperm analysis performed and learned that he had a zero sperm count. Mr. Leguillon subsequently had DNA tests performed, which excluded him as Penni's biological father.

On May 17, 1996, Mr. Leguillon filed objections to an administrative adjustment of child support, and on June 25, 1996, he filed a motion to modify child support. Mr. Leguillon amended his motion on July 22, 1996. After two evidentiary hearings, the trial court's magistrate filed a decision recommending that the trial court deny Mr. Leguillon's motion to modify child support. The trial court ratified the magistrate's decision on April 30, 1997.

The trial court was satisfied that Mr. Leguillon had presented sufficient evidence of a change in circumstances to invoke the court's continuing jurisdiction under Civ.R. 75(I). After considering the evidence, however, the trial court found that there were not "sufficient 'certain circumstances' warranting a termination of the child support order." The court found that there was insufficient evidence of fraud on Mrs. Leguillon's part, and also noted that Mr. Leguillon shared a close relationship with Penni both during and after the marriage, and wanted to continue to have visitation with Penni. The trial court specifically

---

1. Mrs. Leguillon gave birth to three children during the marriage, one of whom died before Penni was born.

found that Mr. Leguillon considered himself Penni's father. Based upon the totality of the circumstances, the trial court refused to terminate the child support order.

Under a single assignment of error on appeal, Mr. Leguillon argues that the trial court erred in refusing to modify his obligation to support Penni. He suggests that once he discovered, after the decree, that he is not Penni's biological father, the trial court had no alternative but to modify (*i.e.*, eliminate) his support obligation. He specifically complains that the trial court erred in considering whether Mrs. Leguillon had acted fraudulently and in considering the best interests of the child.

ANALYSIS

1. Overview

Domestic relations courts have original jurisdiction to consider parentage issues during the pendency of divorce, dissolution, or legal separation actions. R.C. 3111.06(A); R.C. 3111.22(A)(2). As a general rule, however, once a parent-child relationship is established it will not be altered unless it is later vacated, either on direct appeal or pursuant to a recognized legal remedy such as that set forth in Civ.R. 60(B). *Gilbraith v. Hixson* (1987), 32 Ohio St.3d 127, 131, 512 N.E.2d 956, 961 (the doctrine of *res judicata* can be invoked to give conclusive effect to a determination of parentage contained in a dissolution decree or a legitimation order).[2]

Mr. Leguillon never attempted to move for relief from judgment under Civ.R. 60(B), presumably based upon the Ohio Supreme Court's decision in *Strack v. Pelton* (1994), 70 Ohio St.3d 172, 637 N.E.2d 914. In *Strack*, an adjudicated father learned, nine years after the divorce decree establishing paternity, and five years after human leukocyte antigen ("HLA") testing became admissible in Ohio, that HLA tests excluded him as the biological father of the child.[3] Strack then filed a Civ.R. 60(B) motion for relief from judgment. The Supreme Court held

---

**2.** In concluding *res judicata* applies to parentage determinations, the Supreme Court wrote:
 "The establishment and maintenance of the various aspects of the relationship between parent and child is a particularly intricate, sensitive and emotional process with which courts should be reluctant to interfere. In those cases where, by force of events, judicial intervention occurs, where the matter of parentage is determined with finality and in the absence of fraud, and where that determination is not later vacated, either on direct appeal or pursuant to a recognized legal remedy such as that set forth in Civ.R. 60(B), the policy of this state requires, in sum, that the parent-child relationship be shielded from the unsettling effects of further judicial inquiry, and that relitigation of parentage be barred, as a general rule, in any subsequent actions."

**3.** Strack had filed for divorce against his pregnant wife in 1977. Blood grouping tests at the time could not exclude Strack as the father of the child, and the 1978 divorce decree established his child support obligation.

that the HLA test results constituted newly discovered evidence under Civ.R. 60(B)(2). The court wrote:

"Here, Civ.R. 60(B)(2) specifically addresses newly discovered evidence; thus, there is no reason to invoke the less specific catchall provision, Civ.R. 60(B)(5). The claim under Civ.R. 60(B)(4) fails for similar reasons. We hold, therefore, that Civ.R. 60(B)(2) is the provision of the rule that applies to Strack's claim." *Id.* at 174, 637 N.E.2d at 916.

Since there is a one-year time limit for filing a motion for relief under Civ.R. 60(B)(2), and because Strack failed to file his motion within one year from the time that the HLA evidence became admissible, the Supreme Court held that his motion was untimely. The majority was aware that its decision "in effect declares as static a state of facts that reliable scientific evidence contradicts." *Id.* at 175, 637 N.E.2d at 916. Nevertheless, the Supreme Court placed the goal of "finality above perfection in the hierarchy of values." *Id.* The Supreme Court concluded that finality is particularly compelling in a case involving determinations of parentage, visitation, and support of a minor child. *Id.*

The dissent in *Strack* made a compelling argument that under the circumstances, Civ.R. 60(B)(4) was an appropriate mechanism for granting relief from judgment. Justice Pfeifer argued that it would be inequitable to continue *prospective* application of a judgment when the facts underlying that judgment have been unmistakably disproved. *Id.* at 176, 637 N.E.2d at 917. According to Justice Pfeifer, the only consideration was whether the motion was filed within a reasonable time. *Id.* The justice wrote that "the lack of any relationship between Strack and the child is evidence that Strack did file his motion within a reasonable time." *Id.* The dissent specifically noted that the child grew up without the obligor's support and guidance, that the child already lives with a father figure, and concluded that "Strack serves no function to the child, and their legal separation would do no emotional harm to the child." *Id.*

### 2. *Carson v. Carson*

As mentioned, Mr. Leguillon did not seek relief from judgment under Civ.R. 60(B) but instead sought to modify his support obligation through the trial court's continuing jurisdiction under Civ.R. 75(I). In support of his argument that the trial court erred in refusing to terminate his support obligation, Mr. Leguillon relies on this court's decisions in *Carson v. Carson* (1989), 62 Ohio App.3d 670, 577 N.E.2d 391 (Judge Jones dissenting), and *Emery v. Emery* (1995), 101 Ohio App.3d 559, 656 N.E.2d 5 (Judge Koehler concurring in part and dissenting in part). *Carson* was decided before the Supreme Court's decision in *Strack*, while *Emery* was decided shortly after *Strack*.

In *Carson*, this court affirmed the trial court's exercise of its continuing jurisdiction under Civ.R. 75(I) to modify Carson's child support obligation based in part upon clear and convincing evidence that Carson was not the biological father of the child. In that case, Carson had acknowledged paternity during divorce proceedings. Carson later claimed that his former wife had fraudulently induced him to marry her. 62 Ohio App.3d at 674, 577 N.E.2d at 393–394. The trial court ordered HLA tests, and those tests excluded Carson as the child's biological father. The trial court then dissolved the original support order, reduced Carson's arrearage to zero, and absolved him of further responsibility for child support. *Id.* at 672, 577 N.E.2d at 392–393.

On appeal, this court accepted the trial court's finding of fraud at the inception of the marriage. *Id.* at 674, 577 N.E.2d at 393–394. This court also noted that the HLA testing provided clear and convincing evidence that Carson was not the child's biological father. *Id.* Although this court recognized that Civ.R. 60(B) provides the exclusive means to obtain relief from a paternity judgment, *id.* at 672, 577 N.E.2d at 392–393, this court concluded that the evidence of fraudulent inducement and nonpaternity "certainly constitutes a change of circumstances which justifies a modification of the original support order." *Id.* at 674, 577 N.E.2d at 394.

Although *Carson* lends some support to Mr. Leguillon's argument, this court's subsequent decisions have distinguished and limited *Carson*. See, *e.g., Johnson v. Webber* (Dec. 17, 1990), Clermont App. No. CA90–05–041, unreported, 1990 WL 208902 (Judge Koehler concurring separately). In the *Johnson* case, Johnson, like Carson and Mr. Leguillon, acknowledged paternity during divorce proceedings. Eight years later, in response to a contempt motion, he filed a Civ.R. 75(I) motion to modify the support order and requested blood tests. *Id.* at 2. The trial court treated the Civ.R. 75(I) motion as one for relief from judgment under Civ.R. 60(B) and subsequently granted relief.

This court reversed the trial court, writing that "[r]egardless of the procedural grounds upon which it was based, we find that [Johnson's] motion cannot properly be sustained on the state of the record before us." *Id* at 4. This court noted that the doctrine of *res judicata* can be invoked in a postdecree child-support-modification proceeding to give conclusive effect to a parentage determination. *Id.* at 5, citing *Gilbraith,* 32 Ohio St.3d 127, 512 N.E.2d 956.[4] This court expressly distinguished *Carson* because in *Johnson* there was *"no evidence of fraudulent inducement* or the subsequent discovery thereof which would constitute a change of circumstances since the original support order." (Emphasis added.) *Id.* at 6. This court also noted that Johnson admitted that he had

---

4. This court had not addressed the *Gilbraith* decision or the doctrine of *res judicata* in *Carson*.

discussed, but did not pursue, the possibility of blood tests with his attorney during the divorce proceedings. This court concluded that Johnson "had a full and fair opportunity" to contest the paternity issue in the prior divorce proceedings, and that he was "estopped under the doctrine of *res judicata* from relitigating the issue of paternity." *Id.* at 7.

Judge Koehler wrote a concurring opinion in *Johnson.* Judge Koehler recognized the conflicting public policy positions involved: "[F]inancial support should not be terminated if it is 'firmly established.' On the other hand, there is substantial public policy, namely justice, that disfavors a support order against a husband who is not the child's father." *Id.* at 8, citing *Fairrow v. Fairrow* (Ind.1990), 559 N.E.2d 597, 600. Judge Koehler concluded, however, that "such matter must be considered on a case-by-case basis and in this cause I must concur." *Id.* at 8–9.

Shortly after the Supreme Court released its decision in *Strack,* this court addressed another difficult parentage issue in the *Emery* case. In *Emery,* this court affirmed a trial court decision not to order blood tests based upon a child support obligor's allegation, after a sixteen-year delay, that he was not the child's biological father. This court agreed that Emery's simple assertion of nonpaternity was insufficient to invoke the trial court's continuing jurisdiction. See, also, *Kleemeyer v. Hummel* (May 6, 1996), Brown App. No. CA95–10–017, unreported, 1996 WL 227381 (trial court's decision not to order blood tests affirmed where a mother alleged that her child's legal father might not be the child's biological father). In *dicta,* however, this court also added "that *under certain circumstances* an obligor's discovery of nonpaternity *may* constitute a change of circumstances justifying modification of a previous child support order. This may be so even where the obligor may no longer seek relief from the paternity judgment itself under Civ.R. 60(B)." (Emphasis added.) *Id.* at 561, 656 N.E.2d at 7.

 This court is aware of no court outside this district that has applied Civ.R. 75(I) to reduce or eliminate a child support obligation based upon postjudgment evidence of nonpaternity. The First and Second Districts have expressly rejected that approach:

"Simply because the court may have continuing jurisdiction does not empower the court to hear any issue at any time. We hold that Civ.R. 75(I) is not the proper vehicle to initiate a post-decree challenge of paternity. We agree with our colleagues in the Second District that Civ.R. 60(B) provides the only post-decree vehicle to challenge the legitimacy of a child presumed to be the issue of a marriage." (Citation omitted.) *Wood v. Wood* (Apr. 23, 1997), Hamilton App. No. C–960516, unreported; *Springer v. Springer* (Dec. 29, 1992), Clark App. No. 2948, unreported, 1992 WL 389943 ("we are satisfied, notwithstanding *Carson's*

holding to the contrary, that Civ.R. 60[B] provides the only post-decree vehicle available to challenge the legitimacy of a child legally presumed to be the issue of a marriage"); *Moore v. Moore* (Dec. 30, 1992), Hamilton App. No. C–910846, unreported, at 10, 1992 WL 393197 (court distinguished *Carson* by noting that the decision did not consider the doctrine of *res judicata* or address the Supreme Court's *Gilbraith* decision).

■ Moreover, Mr. Leguillon's expansive interpretation of *Carson* to preclude consideration of the child's best interest violates the General Assembly's mandate that a trial court *must* consider the child's best interest before modifying a support obligation. See R.C. 3113.215. In *Carson,* this court did not consider the implications of the Child Support Guidelines set forth in R.C. 3113.215. Before a trial court can issue or *modify* a child support order, however, it *must* "calculate the amount of the obligor's child support obligation in accordance with the basic child support schedule." R.C. 3113.215(B)(1). See, also, *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 601 N.E.2d 496, paragraph two of the syllabus (the terms of R.C. 3113.215 are mandatory in nature and must be followed literally and technically in all material respects). The trial court cannot deviate from the Child Support Guidelines unless its journal entry includes a determination that the calculated support "would be unjust or inappropriate *and would not be in the best interest of the child."* (Emphasis added.) R.C. 3113.215(B)(1) and (2).

■ If this court considered only Mr. Leguillon's interest, the lower court refusal to alter his support obligation seems unjust in light of clear and convincing evidence that he is not Penni's biological father. There are, however, significant interests involved besides his own, the most important being Penni's interests. Continuation of a support obligation after an adjudicated father discovers that he is not the child's biological father may be "unjust or inappropriate," and the elimination of that obligation will be in the best interest of the obligor/father. Modification of support, however, does not alter the legal relationship between the parties, and the trial court must also find that modification is in the child's best interest. See *Marker,* 65 Ohio St.3d at 141, 601 N.E.2d at 498 ("It is obvious from the statutory scheme of R.C. 3113.215 that the overriding concern of the law is 'the best interest of the child' for whom support is being awarded.").

This court must reject Mr. Leguillon's argument that the trial court was obligated to modify (*i.e.,* eliminate) his obligation to provide support to Penni. The *Carson* decision does not support such a rule. Moreover, under existing legislation and Supreme Court precedent, this court is simply not free to adopt a rule that an adjudicated father must be relieved from his support obligations

whenever he comes forward with postdecree evidence that he is not the biological father of the child in question.[5]

Although this court affirms the trial court decision, this court will not end its analysis here. This case and similar cases involve some of the most difficult issues the courts in this district will face. In light of the difficulty and confusion surrounding these issues, this court believes it prudent to set forth some observations and guidance.

Much of the confusion in this area results from the General Assembly's failure to adequately identify the attributes of fatherhood. In his concurring opinion in *Hulett v. Hulett* (1989), 45 Ohio St.3d 288, 295, 544 N.E.2d 257, 263, Justice Herbert Brown discussed the problem:

"At the core of my concern are two failures. First, the statutes with which we must work do not adequately identify the elements of fatherhood. A father-child relationship encompasses more (and greater) considerations than a determination of whose genes the child carries. Sociological and psychological components should be considered. The laws governing adoptions have acknowledged that parentage is comprised of a totality of factors, the least significant of which is genetics. Second, there is a need to separate issues of paternity from issues of fatherhood. The present statutory scheme blurs these issues and lumps them into one pot."

 There are potentially conflicting goals within the various parentage provisions. One obvious goal is to accommodate genetic evidence to ensure that a correct parentage determination is made from the outset. See, *e.g.*, R.C. 3113.09. In fact, the duty to support children applies to "[t]he *biological* or adoptive parent," R.C. 3103.03(A), and Ohio legislation gives precedence to genetic testing over any presumption of legitimacy. *Hulett,* 45 Ohio St.3d at 292, 544 N.E.2d at 260–261. On the other hand, the various parentage provisions encourage and accommodate the establishment of parent-child relationships regardless of whether a genetic relationship is conclusively established. See, *e.g.*, R.C. 2105.18 (probate court may establish a parent-child relationship through acknowledgment proceedings). The General Assembly has not specified that establishment of a genetic relationship is a prerequisite to establishment of a parent-child relationship.

---

5. Even under Justice Pfeifer's persuasive dissent in *Strack,* it is not clear that an obligor should be relieved from his obligations any time he discovers he is not the biological father of the child. Justice Pfeifer concluded that Strack's Civ.R. 60(B)(4) motion was not untimely because there was *no* relationship between Strack and the child; the child had nothing to lose if the trial court had granted relief. Many times, however, an adjudicated father has reason to suspect paternity from the outset. That individual should be estopped from later challenging paternity if his actions and/or inaction prejudiced the child.

One mechanism to avoid dealing with inconsistencies inherent in the various parentage provisions is to strictly construe Civ.R. 60(B) in favor of finality. While reliance on a strict, unyielding interpretation and application of the Civil Rules may serve the judicial goal of finality, it will also inevitably result in seemingly inequitable and unjust results.

Importantly, in focusing on the conflicting interests of "perfection and finality," the majority decision in *Strack* did not consider the best interests of the child. A child's interest in parentage determinations is not necessarily the same as those of the parents. See *Broxterman v. Broxterman* (1995), 101 Ohio App.3d 661, 664, 656 N.E.2d 394, 396–397 (given potential conflict of interest between parents and child in a divorce action, *res judicata* may not apply to child). A child's unique interests include establishment of familial bonds, indoctrination into cultural heritage, knowledge of the family's medical history, and inheritance and other survivorship rights. See *Clark v. Kenley* (Ind.App. 1995), 646 N.E.2d 76, 79.

Nothing in *Strack* should be read to preclude a child, through a legal representative, from bringing an action under R.C. Chapter 3111 to determine the existence or nonexistence of a father-child relationship. Although a paternity adjudication may bar the father from challenging his relationship under the doctrine of *res judicata*, the child may still challenge that relationship since he or she was arguably not in privity with the parties to the original action. See *Broxterman* at 664, 656 N.E.2d at 396–397. Such an action, however, may not be in the child's best interest either economically, emotionally, or temporally. *Broxterman* at 667, 656 N.E.2d at 398–399. Therefore, after a decree of divorce or dissolution has been entered which includes an adjudication or agreement as to parentage and parental rights and obligations, a postdecree paternity action on a child's behalf is subject to the overriding consideration of the child's best interest. *Id.* To aid in making such a determination, the court should consider the appointment of a guardian *ad litem. Id.*[6]

Additionally, this court is not satisfied that the *Strack* decision must be applied inflexibly in every case. See *Cuyahoga Child Support Enforcement Agency v. Guthrie* (Oct. 2, 1997), Cuyahoga App. No. 72216, unreported, 1997 WL 607530, affirmed in part and reversed in part in (1999), 84 Ohio St.3d 437, 705 N.E.2d 318. In fact, the Supreme Court has expressly recognized that the question of whether a motion for relief from judgment should be granted is addressed to the "sound

---

**6.** Appointment of a guardian *ad litem* to protect a child's interests is apparently common practice in other states. See *In re Swanson* (Wash.App. 1997), 88 Wash.App. 128, 944 P.2d 6 (guardian *as litem* and trial court had to consider child's best interests before barring an accurate paternity determination under the doctrine of *res judicata* ).

discretion " of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Strack,* 70 Ohio St.3d at 174, 637 N.E.2d at 915–916.

 In *Guthrie,* the Eighth District Court of Appeals distinguished *Strack.* In that case, the trial court vacated a prior paternity and support order, after genetic test results excluded Guthrie as the biological father of the child.[7] The Eighth District affirmed the trial court on appeal. Significantly, the appellate court rejected the child support agency's reliance on *Strack,* writing:

"In *Strack,* the court reasoned that the paternity test results constituted newly discovered evidence because the technology for such testing was not available at the time of the initial judgment. In this case, the technology for paternity testing was in existence at the time of the initial paternity determination. Consequently, *it does not meet the definition of newly discovered evidence because it could have been discovered by due diligence* in time to move for a new trial." (Emphasis added.) *Id.* at 4–5.

The court in *Guthrie* recognized that the *Strack* decision does not preclude the application of Civ.R. 60(B)(4) in every case. This court is convinced that it is the trial court's responsibility to determine whether a Civ.R. 60(B)(4) motion properly applies in any particular case, and to recast the motion if necessary. See *Gosink v. Hamm* (1996), 111 Ohio App.3d 495, 500, 676 N.E.2d 604, 607–608 (Judge Bettman concurring).

 If a motion for relief from a parentage determination is properly framed as a motion for prospective relief under Civ.R. 60(B)(4), the only remaining issue is whether the motion was filed within a reasonable time. Whether a Civ.R. 60(B)(4) motion is brought within a reasonable time, however, will depend in part on the nature of the relationship between the obligor and the child. See *Strack,* 70 Ohio St.3d at 176, 637 N.E.2d at 917 (Justice Pfeifer dissenting). Where there has never been any relationship between the child and the legal father, it may not be unreasonable *per se* to seek relief several years after the parentage adjudication. *Id.* On the other hand, where the parties have established a relationship, or where the legal father did not act reasonably by failing to seek relief earlier, the determination may be different. In short, the child's interests should be considered along with any action or inaction that could raise an issue of estoppel.[8]

---

7. Guthrie never responded to a parentage complaint against him. On March 23, 1995, the trial court established a parent-child relationship and child support. *Id.* at 2. On September 27, 1995, the child support enforcement agency informed Guthrie that he owed past-due child support. After two continuances, the trial court eventually granted Guthrie's request for genetic testing. The genetic test results excluded Guthrie as the biological father. On February 5, 1997, the trial court vacated its prior paternity and support order.

8. Whether an adjudicated father should be estopped from challenging the relationship could depend on several factors, including (a) whether the obligor had reason to suspect parentage

CONCLUSION

Before paternity is adjudicated a putative father has an absolute right to challenge establishment of a father-child relationship on the basis that he is not the biological father of the child. See, *e.g.*, R.C. 3111.09 (in parentage action, trial court *must* order genetic tests if requested by a party to the action). In stressing finality over perfection, however, the Ohio Supreme Court has, for better or worse, rejected an interpretation of parentage that would place the genetic relationship of the parties above all other considerations. See *Strack*. After an adjudication, and after the provisions in Civ.R. 60(B)(1) to (3) are no longer applicable because of the one-year limitation, the focus is no longer limited to the biological relationship of the parties. In this case, the trial court did not err in considering the child's best interest and other relevant factors in determining not to grant Mr. Leguillon's motion to modify child support.

*Judgment affirmed.*

POWELL, J., concurs.

KOEHLER, J., dissents.

KOEHLER, Judge, dissenting.

First, let me give credit to Brother Young for his well-written opinion dealing with a very complex issue. The opinion examines the various remedies available to appellant, things that he should have done. The opinion further explains the procedural and precedential authorities which deny appellant the relief he seeks. While the Supreme Court has declared that finality prevails over perfection, it is my belief that *Strack* and other courts following *Strack* have made finality a higher priority than justice.

Frequently, we find procedures prevail over facts. We are required to consider the child's best interest. It seems that courts have followed the economical theory to determine the child's best interest. Someone has to pay notwithstanding the facts.

I am convinced that the doctrine of *res judicata* should not prevent the court from vacating a previous determination of parentage when clear and convincing evidence is presented to establish nonpaternity. I am also convinced that

---

and whether he acted reasonably after first developing his suspicions, (b) whether the obligor established a relationship with the child and the nature of the parties' relationship, (c) the likely future of any relationship, (d) and the chance of finding and establishing a relationship with the biological father.

whether relief is sought under a Civ.R. 60(B) motion or 75(I) motion, the result sought depends on the facts and not the fiction.

The majority acknowledges that the genetic relationship is not the focus in such proceeding. The opinion supports the premise that the child's best interest is financial support from the nonbiological father. I support the disposition of such issues on the basis that the child's best interest demands that the child know who the biological father is, or at least permits a legal determination that the putative or presumed father is not the real father. Until the facts prevail, I must dissent.