[Cite as *In re E.B.*, 2023-Ohio-2089.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

In re E.B.

Court of Appeals No.  WD-22-060

Trial Court No.  2021JI0072

**DECISION AND JUDGMENT**

Decided:  June 23, 2023

* * * * *

James S. Ardray, for appellee.

Christine M. Smith, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, H.R., on behalf of her child, E.B., appeals the August 23, 2022 judgment of the Wood County Court of Common Pleas, Juvenile Division, denying her motion for relief from judgment under Civ.R. 60(B), and declining to set aside an acknowledgment of paternity, pursuant to which appellee, R.B., is recognized as the child's legal father.  For the following reasons, we reverse the trial court judgment and remand this matter to the trial court.

## I. Background

{¶ 2} H.R. ("mother") is the mother of E.B. (born in April of 2019). At the time of E.B.'s birth, mother was in a relationship with R.B. ("father"); they lived together, but were not married. Both believed that R.B. was the biological father of E.B. On September 30, 2019, they executed a voluntary acknowledgment of paternity pursuant to which R.B. is recognized as the child's legal father.

{¶ 3} By February of 2020, mother and father's relationship had soured, and mother, E.B., and mother's two older children from previous relationships, moved out of the home they shared with father. Although no formal custody arrangement existed, father exercised parenting time with E.B. on Wednesdays and weekends.

{¶ 4} Sometime in December of 2020, T.M., with whom mother had had a single sexual encounter, saw a picture of E.B. on social media and observed that E.B. looked much like he did at the same age. He reached out to mother, who too saw the resemblance, and she agreed to genetic testing to determine if T.M. was E.B.'s biological father. Test results dated January 25, 2021, confirmed that E.B.'s biological father is, in fact, T.M. ("biological father").

{¶ 5} On February 10, 2021, mother—purportedly on behalf of the child—filed a complaint in parentage asserting that based on the results of the genetic tests, the court should find that a parent-child relationship exists between E.B. and T.M., E.B.'s birth certificate filed with the Bureau of Vital Statistics should be corrected to reflect that T.M.

2.

is E.B.'s father, child support should be established, and parenting time should be ordered.[1]  Biological father filed a motion for visitation.

{¶ 6} Beginning in April of 2021, mother prevented father from visiting with E.B. On April 23, 2021, father moved to establish visitation rights.  On May 10, 2021, he moved for custody and to dismiss mother's complaint and biological father's motion for lack of standing.  In a written decision filed July 15, 2021, the magistrate recommended that father's motion be granted.  Mother filed objections, as did T.M.  Mother also filed a Civ.R. 60(B) motion for relief from judgment.  The trial court overruled mother and T.M.'s objections and adopted the magistrate's July 15, 2021 decision.  Despite the fact that this meant that father's motion to dismiss had been granted—which would ordinarily bring an end to the action—it ordered that the case would remain open for consideration of mother's motion for relief from judgment.

{¶ 7} On May 9, 2022, the magistrate conducted a hearing on mother's Civ.R. 60(B) motion, at which mother, father, and biological father testified.  In a written decision filed June 6, 2022, the magistrate recommended that mother's motion be denied. Mother filed objections to the magistrate's decision.  In a judgment entered on August 23, 2022, the trial court overruled mother's objections and adopted the magistrate's decision. Mother appealed.  She assigns the following errors for our review:

---

[1] For reasons that will become apparent, we characterize the arguments and claims here as belonging to mother.

3.

I. THE TRIAL COURT ERRONEOUSLY INTERPRETED AND RELIED UPON DECISIONS MADE IN *CUYAHOGA ENFORCEMENT AGENCY V. GUTHRIE* (1999), 84 OHIO ST.3D 437 AND *POSKARBIEWICZ V. POSKARBIEWICZ* (NO. L-01-1305 MAR. 22, 2002) 2002-OHIO-3666 IN DETERMINING THAT THE MOTION FOR RELIEF FROM JUDGMENT RELIED UPON NEWLY DISCOVERED EVIDENCE SO THE CHILD IS PRECLUDED FROM ARGUING AND THE COURT FROM CONSIDERING CIV.R. 60(B)(5) AS A BASIS FOR RELIEF[.]

II. THE TRIAL COURT'S TREATMENT OF GENETIC TESTING AS NEWLY DISCOVERED EVIDENCE DENIES DUE PROCESS AND EQUAL PROTECTION OF THE LAW AS APPLIED AND IGNORS [sic] THE SYLLABUS IN *GUTHRIE*[.]

III. THE COURTS OF APPEAL IN OHIO ARE IN CONFLICT AS TO THE APPLICATION OF CIV.R. 60(B) AS TO THE ADJUDICATION OF PATERNITY[.]

IV. THE OVERRIDING OBJECTIVE OF THE CIV.R. 60(B) IS TO AFFECT [sic] JUSTICE. POLICY CONSIDERATIONS OF THE UNIFORM PARENTAGE ACT[,] PARTS OF WHICH HAVE BEEN ADOPTED IN OHIO, DICTATE THE ADOPTION OF A DIFFERENT JUDICIAL INTERPRETATION OF THE USE OF THIS MECHANISM.

THE DECISION BY THE TRIAL COURT TO LIMIT THE

AVAILABILITY OF THE RELIEF IS AN ABUSE OF DISCRETION[.]

## II. Law and Analysis

{¶ 8} In her first assignment of error, mother argues that the trial court misapplied Ohio case law and erred in rejecting her claim that she was entitled to relief under Civ.R. 60(B)(4) or (5). In her second assignment of error, mother argues that by treating genetic testing as newly-discovered evidence, the trial court denied her rights to due process and equal protection under the law. In her third assignment of error, mother argues that there is an interdistrict conflict as to the application of Civ.R. 60(B) as related to the adjudication of paternity. And in her fourth assignment of error, mother argues that policy considerations of the Uniform Parentage Act favor a different judicial interpretation of Civ.R. 60(B) as a mechanism for vacating an acknowledgment of paternity.

{¶ 9} Before addressing mother's assignments of error, we will provide some background concerning the procedure for establishing paternity under R.C. Chapter 3111, and we will explain the underlying findings by the magistrate, which eventually led mother to file her motion for relief from judgment. Because of its tangential relationship to certain of mother's arguments, we will also briefly discuss R.C. 3119.96 et seq., relating to relief from a paternity determination. We will then summarize the parties' arguments in support of their positions on the Civ.R. 60(B) motion and the trial court's reasons for denying the motion.

5.

## A. Procedure for Establishing Paternity

{¶ 10} As previously stated, mother and father executed a voluntary acknowledgment of paternity on September 30, 2019. Under R.C. 3111.02, the parent and child relationship between a child and the child's natural father may be established by an acknowledgment of paternity. A man is presumed to be the child's natural father where an acknowledgment of paternity has been filed and has not become final. R.C. 3111.03(A)(3). Once an acknowledgment of paternity becomes final, it is no longer just a presumption and "shall be considered a final and enforceable determination of paternity unless the acknowledgment is rescinded under [R.C.] 3111.28 or 3119.962." R.C. 3111.03(B).

{¶ 11} Under R.C. 3111.25, "[a]n acknowledgment of paternity is final and enforceable without ratification by a court when the acknowledgment has been filed with the office of child support, the information on the acknowledgment has been entered in the birth registry, and the acknowledgment has not been rescinded and is not subject to possible recission" under R.C. 3111.27. "After an acknowledgment of paternity becomes final and enforceable, the child is the child of the man who signed the acknowledgment of paternity, as though born to him in lawful wedlock." R.C. 3111.26. Except as provided in R.C. 2151.232 or 3111.821, for an acknowledgment of paternity filed with the office of child support to be rescinded, the following must occur:

6.

(1) Not later than *sixty days* after the date of the latest signature on the acknowledgment, *one of the persons who signed it* must do both of the following:

(a) Request a determination under [R.C.] 3111.38 * * * of whether there is a parent and child relationship between the man who signed the acknowledgment and the child who is the subject of it;

(b) Give the office written notice of having complied with division (A)(1)(a) * * * and include in the notice the name of the child support enforcement agency conducting genetic tests to determine whether there is a parent and child relationship;

(2) An order must be issued under [R.C.] 3111.46 * * * determining whether there is a parent and child relationship between the man and the child.

(Emphasis added.) R.C. 3111.27(A). In other words, under this statute, unless someone who has signed an acknowledgment of paternity takes action to rescind it within 60 days after it is filed with the office of child support and entered in the birth registry, an acknowledgment of paternity is final and enforceable.

{¶ 12} There is a second method for rescinding an acknowledgment of paternity. Under R.C. 3111.28, after an acknowledgment becomes final, "*a man presumed to be the father* of the child * * * *who did not sign the acknowledgment*, *either person who signed the acknowledgment*, or *a guardian or legal custodian of the child* may bring an action to

7.

rescind the acknowledgment *on the basis of fraud, duress, or material mistake of fact*." (Emphasis added.) An action under R.C. 3111.28 must be brought "no later than *one year* after the acknowledgment becomes final." (Emphasis added.) *Id.* Restated, once an acknowledgment of paternity becomes final, an action to rescind the acknowledgment may be brought within one year of it becoming final by (1) a man presumed to be the child's father who did not sign the acknowledgment, (2) either person who signed the acknowledgment, or (3) a guardian or legal custodian of the child, but only on the basis of fraud, duress, or material mistake of fact.

{¶ 13} The magistrate observed that no one had alleged that there was any defect in the acknowledgment of paternity or that it had not been filed with the office of child support and entered in the birth registry. She also observed that neither mother nor father had taken steps to rescind the acknowledgment within 60 days and no one had filed any action within one year of the acknowledgment becoming final. As such, the magistrate concluded that father is the legal father of the minor child and his "status as legal father is a final enforceable order."

{¶ 14} The magistrate further noted that Ohio does not recognize more than two legal parents. And because the acknowledgment of paternity and the passage of time rendered father's status final and enforceable, mother's complaint could not be viewed as an action to determine the existence or nonexistence of a father and child relationship under R.C. 3111.04. She explained that "to establish paternity anew," mother "would first need to successfully vacate the finding of paternity already in place." The magistrate

8.

pointed out that no Civ.R. 60(B) motion had been filed, thus she declined to address the potential application of Civ.R. 60(B) to the parties' dispute.

## B.  Procedure for Challenging a Paternity Determination

{¶ 15} Although not directly pertinent to this matter, R.C. 3119.961(A) provides a mechanism under which—"[n]otwithstanding the provisions to the contrary in Civil Rule 60(B)"—a (male) person may seek relief from a final judgment, court order, or administrative determination or order (including an acknowledgment of paternity that has become final) determining that he is the father of a child.  Under R.C. 3119.962(A)(1), a court shall grant relief from a final judgment, court order, or administrative determination or order that determines that a person is the father of a child if "(a) [t]he court receives genetic test results from a genetic test administered no more than six months prior to the filing of the motion for relief that finds that there is a zero per cent probability that the person or male minor is the father of the child; (b) [t]he person or male minor has not adopted the child; and (c) [t]he child was not conceived as a result of artificial insemination * * *."

{¶ 16} If the person *did not know* that he was not the natural father of a child, a court may not deny relief solely because (a) the person was required by a child support order to support the child; (b) the person validly signed the child's birth certificate as an informant under former R.C. 3705.09; (c) the person was named in an acknowledgment of paternity under former R.C. 2105.18; (d) the person was named in an acknowledgment of paternity of the child that has become final under R.C. 2151.232, 3111.25, or

9.

3111.821 or former R.C. 3111.211 or 5101.314; (e) the person was presumed to be the natural father of the child under R.C. 3111.03; (f) the person was presumed to be the natural father of the child under former R.C. 3111.03(A)(3) or (5); (g) the person was determined to be the father of the child in a parentage action under R.C. Chapter 3111; or (h) the person otherwise admitted or acknowledged himself to be the child's natural father. R.C. 3119.962(A)(2)(a) to (h).

{¶ 17} Finally, a court may not grant relief from a final judgment, court order, or administrative determination or order that determines that a person is the father of a child if it determines, by a preponderance of the evidence, that *the person knew* that he was not the natural father of the child before (1) any act listed in R.C. 3119.962 (A)(2)(a) to (d) and (A)(2)(f) occurred; (2) the person was presumed to be the natural father of the child under any of the circumstances listed in R.C. 3111.03(A)(1) to (3); or (3) the person otherwise admitted or acknowledged himself to be the child's father. R.C. 3119.962(B)(1) to (3).

{¶ 18} By its own terms, only a person who has been determined to be a father may utilize the procedure set forth in R.C. 3119.96 et seq. *See Demore v. Demore*, 11th Dist. Lake No. 2007-L-164, 2008-Ohio-1328, ¶ 20 ("[B]y its very language, R.C. 3119.961(A) only allows putative fathers—males, adult or minor—to challenge a prior finding of paternity outside the parameters of Civ.R. 60(B).").

10.

## C.  The Civ.R. 60(B) Motion

{¶ 19} After filing objections to the magistrate's decision, but before the trial court ruled on them, mother filed a motion for relief from judgment under Civ.R. 60(B).  The trial court overruled mother's objections and adopted the magistrate's decision, but ordered that the case remain open so that it could rule on mother's motion.

{¶ 20} Under Civ.R. 60(B), "the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(B); (3) fraud * * *, misrepresentation or other misconduct of an adverse party; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the judgment."  A motion under Civ.R. 60(B) must be made within a reasonable time, "and for reasons (1), (2) and (3) not more than one year after the judgment, order or proceeding was entered or taken."

{¶ 21} The Supreme Court of Ohio has held that to prevail on a motion for relief from judgment under Civ.R. 60(B), the moving party must demonstrate: "(1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ. R. 60(B)(1) through (5); and (3) the motion is made within a reasonable time, and, where the grounds of relief are Civ.R. 60(B)(1),

11.

(2) or (3), not more than one year after the judgment, order or proceeding was entered or taken. *GTE Automatic Electric, Inc. v. Arc Industries, Inc.*, 47 Ohio St.2d 146, 351 N.E.2d 113 (1976), paragraph two of the syllabus.

{¶ 22} It is not entirely clear from her motion which provisions of Civ.R. 60(B) mother relied on in seeking to vacate the judgment of paternity. Mother's brief in support of her motion was not neatly organized to correspond to any single provision, so we will just briefly summarize the substance of her arguments.

{¶ 23} First, mother argued that while Article I, Section 16 of the Ohio Constitution provides that "all courts shall be open, and every person * * * shall have remedy by due course of law * * *," the only opportunity that the child had here to contest father's paternity judgment was Civ.R. 60(B). She complained that "legal fathers" have more avenues available to them than mothers, children, and natural fathers.

{¶ 24} Second, mother argued that a Civ.R. 60(B) motion should be granted when a person mistakenly believes he is the child's legal father, but genetic testing proves that he is not. She insisted that it is in the child's best interest that his biological father be granted rights to rear the child. She contended that by failing to recognize a parent-child relationship between a child and biological father, the child may be deprived of familial bonds, cultural heritage, knowledge of family medical history, inheritance and survivorship rights, religious attachments, language, family traditions, and biological father's special skills, education, and history. Mother maintained that E.B. had no established relationship with father and no bonding had occurred between them—

12.

assertions that would later be proven false at the evidentiary hearing—and father has not supported child.

{¶ 25} Third, mother argued, in essence, that father is not a good father and biological father is a good father. She claimed that father had not supported, taken care of, nurtured, or actively reared the child. She insisted that biological father is willing to and has done these things. Mother maintained that "equity and good conscience" required that the child be relieved "from any judgment that forces a relationship with" father.

{¶ 26} Fourth, mother argued that "prospective application of [the] final judgment raises things to an absurdity." She maintained that father wants to be recognized as E.B.'s legal father for "less than honorable reasons." Mother emphasized that while there had been no support order set, father could have voluntarily supported E.B., but has not. She insisted that if the judgment is vacated, biological father stands ready, able, and willing to support E.B.

{¶ 27} Fifth, mother argued that Civ.R. 60(B)(5) would allow the court to strike a balance between "the sanctity of final judgments and the need for ongoing or executory equitable remedies." She insisted that vacating the judgment would not work a hardship against any person "or create any significant problem with regard to the administration of justice." Mother claimed there was "no downside" to vacating the judgment and no prejudice to father because father "has done absolutely nothing to help, assist or care for the child since birth," whereas relief from the prospective application of the judgment

13.

would create statutory duties for biological father that he is willing to honor and would give him the right to participate in E.B.'s life.

{¶ 28} Finally, mother argued that the statutory scheme in Ohio's Parentage Act is unconstitutional because it violates child and biological father's rights to due process and equal protection under the law. She questioned why legal fathers should have access to the courts to seek relief from a judgment of paternity, but no one else. Mother insisted that R.C. 3111.04 permitted the child to pursue an action here, and by holding that R.C. 3111.04 is not available after paternity is established otherwise, Ohio courts violate the rights of the child, biological father, and mother.

{¶ 29} Father responded that E.B. was not a party to the acknowledgment of paternity, therefore, he lacks standing to alter the judgment or interfere with its prospective effects. Moreover, father argued, if he was going to challenge the acknowledgment, E.B. was required to do so within 60 days of its execution or, if he could show fraud, duress, or a material mistake of fact, within one year; res judicata now bars relitigation. Father claimed that mother was attempting to use Civ.R. 60(B) as a substitute for appeal. He maintained that mother failed to follow the proper procedures for challenging the constitutionality of the Ohio Parentage Act. Finally, father alleged that mother was the actual party here whose objective was simply "to trade fathers."

{¶ 30} The magistrate conducted an evidentiary hearing on May 9, 2022. Mother and father both testified that they believed that he was the child's biological father. They executed an acknowledgment of paternity because father was not at the hospital during

14.

the hours when the employee responsible for filing birth certificates worked. Mother claimed that she was afraid and cried on the way to the health department, however, father disputed this. Mother claimed that father drank too much and did not help with childcare. Both mother and father agreed that their relationship was "toxic."

{¶ 31} Mother testified that she lived with father from April of 2019 until February of 2020, when she and her three children moved out of father's home. When mother and her children lived with father, he did not charge her rent, but she paid for cable, internet, and food. Father maintained health insurance for E.B. until January of 2021, when he learned that T.M. was E.B.'s biological father.; not knowing the law, he did not believe that he would continue to be recognized as E.B.'s legal father. Mother claimed that father sporadically provided financial assistance after mother moved out, but provided practically no assistance after learning that he was not the biological father. Father took the child tax credit for E.B. and did not share it with mother.

{¶ 32} Mother acknowledged that father was emotional when mother moved out because he went from seeing E.B. all the time to not seeing him at all. She testified that from the time she moved out in February of 2020, until January of 2021, father exercised parenting time with the child. Father's parents also love and visited with the child. When with mother, E.B. calls T.M. "daddy" and calls R.B. "his Ryan." When E.B. is with R.B., he calls him dad. Father loves E.B. and does not want to walk away from him despite the fact that they are not biologically related. Nevertheless, mother believes that it is in E.B.'s best interest to remove father from E.B.'s life.

15.

{¶ 33} In April of 2021, mother texted father and told him that at the advice of her attorney, he could not spend time with E.B. In September of 2021, the parties compromised to permit E.B. time with father and this was reflected in a court order. Father testified that when he picked E.B. up for the first time in September of 2021, E.B. jumped into his arms and screamed "daddy." Mother stopped abiding by the court order in February of 2022.

{¶ 34} Mother explained that she first discovered that R.B. may not be E.B.'s biological father when T.M. reached out to her concerning his resemblance to the child. She had had nonconsensual sex with T.M. in September of 2018. She had heard that he was "sterile" and she never told father about the incident because she was afraid. Genetic testing in January of 2021, confirmed that T.M. is the biological father. Mother and T.M. testified that T.M. has provided love, care, and financial support for mother, E.B., and mother's other children. Although they are not in a relationship and mother now lives with another man, mother and biological father conceived a second child together, born approximately two-and-a-half years after E.B. Biological father visits practically daily and his family sees E.B. too. He has $150 per week directly deposited into mother's bank account and frequently buys other things for E.B. and mother's other children. Mother and biological father's second child has a genetic illness, and they fear that E.B. may also have inherited the illness.

{¶ 35} The magistrate reiterated that R.B. is E.B.'s legal father based on the finality of the acknowledgment of paternity. She explained that once final and

16.

enforceable, an acknowledgment of paternity cannot be rebutted, even by the results of genetic testing. The magistrate interpreted mother's brief as an attempt to vacate the acknowledgment of paternity rather than an attempt to vacate the court's August 31, 2021 judgment confirming the enforceable finding of paternity.

{¶ 36} The magistrate rejected father's position that E.B. lacked standing to challenge the acknowledgment of paternity under Civ.R. 60(B). She found that as to the request for relief itself, the child had a meritorious claim because the genetic test established to a 99.99 percent certainty that T.M. is his biological father. The magistrate went on to examine mother's Civ.R. 60(B) motion under every possible ground—i.e., subsections (1) through (5).

{¶ 37} The magistrate found that the acknowledgment of paternity became final and enforceable on September 30, 2020—one year after it was executed—therefore, a Civ.R. 60(B) motion under (1), (2), or (3), would be timely if filed before September 29, 2021. She concluded that the motion was timely because it was filed August 25, 2021.

{¶ 38} Under Civ.R. 60(B)(1)—mistake, inadvertence, surprise or excusable neglect—the magistrate identified that the mistake alleged here is that mother and father executed the acknowledgment of paternity mistakenly believing that father was E.B.'s biological father. The magistrate characterized the acknowledgment of paternity as a consent judgment to which the parties voluntarily agreed. She observed that to attack a consent judgment, the movant must show why he or she was justified in failing to avoid the mistake or inadvertence—carelessness is insufficient.

17.

{¶ 39} The magistrate recognized that mother claimed that father forced her to sign the acknowledgment, but the magistrate did not find this testimony credible, particularly because the acknowledgment had been signed in the presence of a notary, who would have been prohibited under R.C. 147.141(14) from notarizing it if it appeared that the signer was coerced or unduly influenced. Moreover, the magistrate questioned why mother would have been unwilling to sign the acknowledgment if, as she testified, she believed R.B. was E.B.'s biological father.

{¶ 40} The magistrate emphasized that mother was in a position to know that there were two potential fathers of her child because she engaged in sexual relations with both men. She did not believe mother's testimony that she thought that T.M. was infertile and, therefore, that it was impossible that he could be the father. She pointed out that under Ohio law, "a person who has sexual intercourse with another is effectively on notice that person may be a parent with certain rights." The magistrate imputed mother's knowledge to E.B. She emphasized that mother could have sought genetic testing before executing the acknowledgment of paternity or before the one-year rescission deadline. In sum, she concluded that mother was not justified in failing to avoid the mistake here, thus she was not entitled to relief under Civ.R. 60(B)(1).

{¶ 41} Under Civ.R. 60(B)(2)—newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial—the magistrate acknowledged that genetic test results demonstrated that T.M. is E.B.'s biological father. But she cited *Strack v. Pelton*, 70 Ohio St.3d 172, 637 N.E.2d 914 (1994), for the

18.

proposition that "for purposes of Civ.R. 60(B)(2), results of a paternity test, not obtained and thus not provided until after the adjudication of the existence of a parent-and-child relationship, are not 'newly discovered evidence.'" (The magistrate attributed this quote to the wrong case. It actually appears in *Cuyahoga Support Enf't Agency v. Guthrie,* 84 Ohio St.3d 437, 442, 705 N.E.2d 318 (1999).) The magistrate stated that the *Strack* court had characterized this evidence as "late-discovered evidence" rather than "newly-discovered evidence" because paternity tests could have been obtained before a paternity judgment. (Again, the magistrate incorrectly attributed this quote to *Strack.* The term "late-discovered evidence" was actually used in this court's decision in *Poskarbiewicz v. Poskarbiewicz*, 6th Dist. Lucas No. L-01-1305, 2002 WL 445058, * 2 (Mar. 22, 2002).) The magistrate emphasized that mother had access to genetic testing before the acknowledgment of paternity became final and enforceable. She concluded that relief was not available under Civ.R. 60(B)(2).

{¶ 42} Under Civ.R. 60(B)(3)—fraud * * *, misrepresentation or other misconduct of an adverse party—the magistrate found that there had been no allegations that any party engaged in fraudulent behavior; they genuinely believed that R.B. was the child's biological father.

{¶ 43} Under Civ.R. 60(B)(4)—it is no longer equitable that the judgment should have prospective application—the magistrate cited *Guthrie*, where the Ohio Supreme Court held that (B)(4) "was not meant to offer a party a means to negate a prior finding that the party could have reasonably prevented." *Id.* at 443. The magistrate explained

that in *Guthrie,* the court recognized that relief from a paternity judgment was not available under this subsection where a party was aware of the parentage proceedings and made a voluntary, deliberate choice not to seek genetic testing until after a finding of parentage. To hold otherwise, the court explained, would encourage litigants to litigate carelessly, judgment winners would be unable to rely on their victories, and judicial economy would be subverted, opening the "proverbial floodgates, causing Ohio's courts to drown in a sea of duplicative, never-ending litigation." *Id.* The magistrate rejected the argument that the child himself could not have prevented the original acknowledgment of paternity, explaining that he could have—through his guardian or representative—moved to rescind the acknowledgment before it became final. The magistrate noted that this court had applied *Guthrie* in *Poskarbiewicz,* 6th Dist. Lucas No. L-01-1305, 2002-Ohio-3666, involving a support order premised on late-discovered evidence, and reached the same conclusion as *Guthrie.*

{¶ 44} Under Civ.R. 60(B)(5)—any other reason justifying relief from the judgment—the magistrate cautioned that this provision has been narrowly defined and should form the basis for granting relief from judgment only in extraordinary circumstances. She emphasized that in *Poskarbiewicz,* this court observed that (B)(5) is not available to challenge a judgment based on late-discovered genetic test results. She also cited *Atchison v. Atchison*, 4th Dist. Scioto No. 00CA2727, 2001 WL 812804 (June 29, 2001), where the Fourth District applied *Guthrie* in concluding that (B)(5) does not apply where a more specific provision of Civ.R. 60(B) applies—in this case (B)(2). The

20.

magistrate concluded that because paternity testing was available before the acknowledgment of paternity became final and enforceable, (B)(2) could not form the basis for vacating the judgment, nor would the less specific provision, (B)(5), allow a second bite at the apple.

{¶ 45} The magistrate acknowledged that the Fifth District in *West v. Reichman*, 5th Dist. Tuscarawas No. 2019 AP 10 0044, 2020-Ohio-1226, and the Eighth District in *Mitchell v. Mitchell¸* 8th Dist. Cuyahoga No. 50889, 1987 WL 6545 (Feb. 12, 1987), relied on Civ.R. 60(B)(5) to provide relief from a paternity judgment, but she afforded those cases no weight because *West* failed to cite *Guthrie,* and *Mitchell* was decided before *Guthrie.*

{¶ 46} The magistrate addressed—and rejected—other arguments raised by mother. She found that (1) R.C. 3119.961 et seq. is inapplicable here because father has not tried to invoke any rights under this statute; (2) the Ohio Supreme Court in *State ex rel. Loyd v. Lovelady*, 108 Ohio St.3d 86, 2006-Ohio-161, 840 N.E.2d 1062, has already ruled that R.C. 3119.961 et seq. is constitutional; (3) the child had the same right to seek rescission as anyone else under R.C. 3111.27 and 3111.28, but failed to avail himself of that procedure; (4) R.C. 3111.01 et seq. provides all parties access to the courts—mother, E.B., and biological father simply failed to avail themselves of those rights in a timely manner; (5) although the circumstances are difficult, there are compelling reasons for declining to disrupt the finality of an acknowledgment of paternity, even where it has been shown that another man is the child's biological father; (6) factors that mother

21.

claims are counter to E.B.'s best interests are largely able to be overcome (e.g., the passing down of cultural and religious heritage, family traditions, medical history, inheritance); (7) the evidence at the hearing demonstrated that father is not a stranger to E.B.—the child and father have a bond, father exercised parenting time on a regular basis, father provided financial support the first nine months of E.B.'s life, the child loves father, and terminating this relationship would not be in the child's best interest; (8) mother has not followed the procedures for challenging the constitutionality of Ohio's Paternity Act; (9) mother, child, and biological father were not denied due process or equal protection—they simply chose not to pursue the remedies available to them in a timely fashion; and (10) R.C. 3111.04 precludes disturbing a determination of paternity by a parentage action.

{¶ 47} The magistrate determined that a guardian ad litem should be appointed in this case and did so in a separate entry after filing its decision on mother's Civ.R. 60(B) motion. As such, at the time she rendered her decision, the magistrate did not have available any recommendations from a disinterested third party purporting to represent solely the child's best interest.

{¶ 48} Mother filed objections to the magistrate's decision, which the trial court overruled in a detailed judgment entry. Without reciting the objections or describing in detail all the arguments in support and in opposition to those objections, we briefly summarize the findings of the court relevant to those objections:

22.

(1) Under *Guthrie*, genetic tests are not "newly-discovered evidence" because they could have been obtained by due diligence by mother or anyone acting as E.B.'s legal guardian or custodian;

(2) Mother failed to provide sufficient evidence of fraud or other grounds sufficient for relief under Civ.R. 60(B)(3);

(3) Civ.R. 60(B)(4) is not available because mother had an opportunity to foresee or control the circumstances and reasonably prevent the underlying paternity finding;

(4) *Guthrie* is not limited to support-related matters;

(5) Mother knew there was at least a possibility that T.M. was E.B.'s father, yet made the voluntary decision not to rescind the acknowledgment of paternity;

(6) A paternity finding arising from an acknowledgment of paternity, which has not been rescinded or vacated, is a valid final order;

(7) E.B., through his guardian or legal representative, could have taken steps to rescind the acknowledgment of paternity;

(8) Ohio parentage law has been evolving, and the legislature and courts are responding to this evolution, albeit not as quickly as a party may wish;

(9) The court is not authorized to dismantle key provisions of Ohio parentage laws;

(10) R.C. 3119.961 and 3119.962 are solely for the benefit of fathers—those statutes remain valid and have been deemed constitutional on other grounds by the Ohio Supreme Court;

(11) Mother's constitutional challenges are not procedurally proper—they should have been raised in the complaint and served on the attorney general;

(12) The court disagrees that the statutes and case law place procedure over the child's best interests;

(13) E.B. deserves finality as to his parentage—mother's efforts to vacate the established paternity finding is inconsistent with E.B.'s best interest;

(14) Father has an established parent-child relationship with E.B.. has had ongoing contact with him throughout his life, lived with him from April 2019 to February 2020, and exercised parenting time with him mid-week and weekends after mother and child moved out;

(15) Father's parents have developed a relationship with the child;

(16) A guardian ad litem has been appointed to protect E.B.'s interests as opposed to the interests of the adults in this matter—his welfare has not been overlooked; and

(17) The unique facts of this case provide the child with the opportunity to have multiple adults involved in his life and the parties should seize this opportunity and resolve the ongoing matter.

The trial court adopted the decision of the magistrate.

## D. The Assignments of Error

{¶ 49} Having explained this background, we now address mother's assignments of error. But first, we must determine the date on which the acknowledgment of paternity became final and enforceable. This is important because Civ.R. 60(B)(1), (2), and (3), require that a motion for relief from judgment be filed within one year of the judgment at issue.

{¶ 50} Here, the judgment at issue is the acknowledgment of paternity. The trial court assumed that the acknowledgment became final on September 30, 2020—one year after it was executed—therefore, a Civ.R. 60(B) motion under (1), (2), or (3), would be timely if filed before September 29, 2021. It concluded that the motion was timely because it was filed August 25, 2021. We find, however, that the acknowledgment became final on November 29, 2019—60 days after it was executed. We reach this conclusion based on the language of R.C. 3111.25: "An acknowledgment of paternity is final and enforceable without ratification by a court when the acknowledgment has been filed with the office of child support, the information on the acknowledgment has been entered in the birth registry, and the acknowledgment has not been rescinded and is not subject to possible recission" under R.C. 3111.27. R.C. 3111.27 permits rescission only within 60 days. Accordingly, the acknowledgment of paternity became final on November 29, 2019. *See In re P.L.,* 8th Dist. Cuyahoga No. 108312, 2019-Ohio-4681, ¶ 3, 91 (explaining that acknowledgment of paternity became final and enforceable on July 14, 2008, where it was executed May 14, 2008).

25.

{¶ 51} Because the acknowledgment became final and enforceable on November 29, 2019, mother's complaint was not filed until February 10, 2021, and her Civ.R. 60(B) motion was not filed until August 25, 2021—more than a year after the judgment—relief under Civ.R. 60(B)(1) to (3) is not available to mother. Evidently realizing this, mother's assignments of error are not premised on those provisions of the rule. Thus, despite the magistrate's incorrect calculation of the date the acknowledgment became final, and despite her analysis of Civ.R. 60(B)(1), (2), or (3), mother limits her Civ.R. 60(B) arguments to provisions (4) and (5), and so will we.

{¶ 52} We review a trial court judgment denying a motion for relief from judgment under an abuse of discretion standard. *Kerger & Hartman, LLC v. Ajami*, 6th Dist. Lucas No. L-16-1135, 2017-Ohio-7352, ¶ 13. An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### 1. Applicability of Civ.R. 60(B)(4) or (5)

{¶ 53} In her first assignment of error, mother argues that the trial court incorrectly relied on *Guthrie,* 84 Ohio St.3d 437, 442, 705 N.E.2d 318, and *Poskarbiewicz*, 6th Dist. Lucas No. L-01-1305, 2002-Ohio-3666, in denying relief under Civ.R. 60(B)(4) or (5) on the basis that the more specific provision of Civ.R. 60(B)(2) applies. Mother claims that in determining that Civ.R. 60(B)(5) is inapplicable here, the trial court failed to recognize that *Guthrie* and *Poskarbiewicz* were, by their own language, limited to child support orders and are not applicable to actions challenging

26.

paternity filed by or on behalf of the child. Mother also complains that genetic tests are, but should not be, treated differently depending on the litigant; Civ.R. 60(B)(2) forces a deadline on mother and child but not on legal fathers. And she insists that because *Guthrie* holds that genetic tests are not "new evidence," Civ.R. 60(B)(4) provides a mechanism for vacating a paternity judgment on the basis of genetic tests establishing non-paternity.

{¶ 54} In *Guthrie,* the Cuyahoga Support Enforcement Agency conducted an administrative hearing in 1994 to determine whether there existed a parent-child relationship between Guthrie and the child, born four years earlier. Guthrie failed to appear, so the determination of parentage was denied. Soon after denying the administrative action, CSEA filed a parentage action in the juvenile court. The agency sought reimbursement for the expenses of birth and other public assistance and requested child support. Despite notice to Guthrie, he again failed to appear. The magistrate determined that Guthrie was the child's father and ordered him to pay child support.

{¶ 55} Six months later, Guthrie was informed that he owed arrearages of $960. The notice informed him that he could challenge the arrearage by contacting CSEA by November 30, 1995. Two weeks before that deadline, Guthrie sought a delay and requested counsel. The matter was set for hearing; this time mother failed to appear. Guthrie requested genetic testing, which the magistrate granted. The tests showed a zero percent chance that Guthrie was the father. The court found that he was not the child's

27.

father, granted judgment in his favor, and "vacated and set aside" the magistrate's previous decision. The court of appeals affirmed.

{¶ 56} The Eighth District Court of Appeals certified the following question to the Ohio Supreme Court: "When a motion for relief from a judgment of paternity is based on the results of genetic testing, can such motion be brought under Civ.R. 60(B)(4), which provides for relief when the continued application of the judgment would be inequitable or must the motion be reviewed under Civ.R. 60(B)(2), which provides for relief based upon newly discovered evidence?" *Id.* at 20. The court of appeals had held that the juvenile court's order vacating the initial determination of parentage and interim order of support was authorized under Civ.R. 60(B)(4). CSEA contended that relief from a prior determination of parentage premised upon later genetic testing can be authorized under Civ.R. 60(B)(2), but not (B)(4). The Ohio Supreme Court concluded that neither Civ.R. 60(B)(2) nor (4) controlled the outcome of the case.

{¶ 57} The court acknowledged its decision in *Strack*, 70 Ohio St.3d 172, 637 N.E.2d 914, where it held that a motion to set aside provisions of a divorce decree relating to paternity, which is premised on the results of genetic tests, must be evaluated as newly-discovered evidence under Civ.R. 60(B)(2)—not the less specific catch-all of Civ.R. 60(B)(4) or Civ.R. 60(B)(5). As such, the court found, the motion had to be filed within one year of the judgment. Strack filed his motion nine years after the initial paternity determination and three years after genetic testing was deemed admissible evidence. The court explained that "[t]he time limits of Civ.R. 60(B) refer to the

28.

judgment from which relief is sought, not to the time of discovery of the new evidence." *Id.* at 175. Moreover, it continued, "even if [it] were to apply Civ.R. 60(B) loosely and allow extra time not provided for by the rule, [it] would have to look to the time when the evidence became admissible to determine paternity[.]" *Id.* That time had also passed.

{¶ 58} The *Strack* court recognized that its decision "declare[d] as static a state of facts that reliable scientific evidence contradict[ed]." *Id.* Nevertheless, balancing the competing principles of "finality and perfection," it determined that "[f]inality is particularly compelling in a case involving determinations of parentage, visitation and support of a minor child." *Id.*

{¶ 59} Turning back to *Guthrie,* CSEA argued that *Strack* was dispositive of the question before the court. It asserted that the genetic test results demonstrating that Guthrie was not the child's father constituted "newly discovered evidence" under Civ.R. 60(B)(2). And because Guthrie requested genetic testing more than one year after the initial determination of paternity, his request was untimely.

{¶ 60} The Ohio Supreme Court found *Strack* distinguishable, however. It explained that it did not state in *Strack,* "nor did [it] intend to establish an absolute rule that Civ.R. 60(B)(2) was to have universal application in every situation where later tests are submitted to challenge a previous determination of paternity." *Guthrie* at 442. It cautioned that to do so "would leave little room for a court to consider all the interests involved in these types of cases, including the welfare of the minor child, and to balance all of the equities." *Id.* It further reasoned that *Strack* involved "genetic testing whose

29.

technology was not available at the time of the initial determination of paternity"—that's why it constituted *newly*-discovered evidence.  But genetic testing was available to Guthrie and was not newly-discovered evidence "because it could have been discovered by due diligence in time to move for a new trial."  *Id.,* quoting *Cuyahoga Child Support Enf't Agency v. Guthrie*, 8th Dist. Cuyahoga No. 72216, 1997 WL 607530, *2 (Oct. 2, 1997).  The Ohio Supreme Court also pointed out that in *Strack*, the father actually filed a Civ.R. 60(B) motion; Guthrie did not, therefore, "the court did not make a Civ.R. 60(B) ruling."  *Id.* at 442.

{¶ 61} In sum, the Ohio Supreme Court held in *Guthrie* that "for purposes of Civ.R. 60(B)(2), results of a paternity test, not obtained and thus not provided until after an adjudication of the existence of a parent-and-child relationship, are not 'newly discovered evidence.'"  *Id.* at 437.  But it also rejected the Eighth District's conclusion that Civ.R. 60(B)(4) could provide relief under the circumstances.  It explained that the "no longer equitable" clause of Civ.R. 60(B)(4) "was designed to provide relief to those who have been prospectively subjected to circumstances *which they had no opportunity to foresee or control*"—it "was not meant to offer a party a means to negate a prior finding that the party could have reasonably prevented."  (Emphasis added.)  *Id.* at 443, quoting *Knapp v. Knapp,* 24 Ohio St.3d 141, 493 N.E.2d 1353 (1986), paragraph one of the syllabus. Because Guthrie did not appear at trial despite being aware of the parentage proceedings against him and was aware that genetic testing could have been performed, the court found that "he made a voluntary, deliberate choice not to seek genetic testing

30.

until after a finding of parentage and until after he was notified of a support arrearage" and was not entitled to relief under Civ.R. 60(B)(4). *Id.*

{¶ 62} The court did find in *Guthrie*, however, that the juvenile court had continuing jurisdiction under R.C. 3111.16 "*to modify or revoke a judgment or order issued under sections 3111.01 to 3111.19 of the Revised Code to provide for future education and support and a judgment or order issued with respect to matters listed in divisions (C) and (D) of section 3111.13 and division (B) of section 3111.15 of the Revised Code * * *.*" (Emphasis in original.) *Id.,* quoting R.C. 3111.16. As such, the Ohio Supreme Court affirmed the lower court's decision to vacate the prior finding of paternity on the basis that "the subsequent finding of nonpaternity constituted a change in circumstances that warranted relief from the initial finding of parentage." *Id.* at 444. But because Guthrie deliberately disregarded initial parentage proceedings, thereby causing a delay of the finding of nonpaternity, it declined to relieve him of the responsibility of paying arrearages.

{¶ 63} We later applied *Guthrie* in *Poskarbiewicz*, 6th Dist. Lucas No. L-01-1305, 2002-Ohio-3666. There, father moved under Civ.R. 60(B)(5) to set aside his child support obligations. The trial court granted his motion, and father appealed.

{¶ 64} In *Poskarbiewicz,* mother and father married in 1975, but were together for less than seven months. In 1976, during their divorce proceedings, mother gave birth to child. Father denied that he was the child's father, but the domestic relations court found

31.

that he did not present sufficient evidence to rebut the presumption that he was the father of the child born during the marriage. Father was ordered to pay child support.

{¶ 65} In 1994, just before the child turned 18, father again contested paternity. The court rejected his claim on the basis of res judicata. He owed arrearages at that time. In 1999, Lucas County Child Support Enforcement Agency stepped up efforts to collect arrearages incurred before 1994. The same year, father and the now 23-year-old child submitted to genetic testing. This testing revealed that there was a zero percent chance that he was the father. He moved to terminate child support and eliminate arrearages.

{¶ 66} The magistrate interpreted father's motion as a motion for relief from judgment under Civ.R. 60(B). She found that the genetic test results constituted newly-discovered evidence and evaluated the motion under Civ.R. 60(B)(2). She denied father's motion as untimely. Father objected. The trial court reversed and granted father's motion under Civ.R. 60(B)(5). Mother appealed.

{¶ 67} Mother argued, among other things, that the court erred in failing to reject father's motion under *Strack*. We acknowledged that *Strack* and *Guthrie* "make clear that Civ.R. 60(B)(2) and (4) are not available to support orders in relief from a judgment premised on late discovered evidence." *Id.* at * 2. We further explained that "Civ.R. 60(B)(5) applies only when one of the other Civ.R 60(B) categories does not apply." *Id.* Because the more-specific category of (B)(2) applied, we concluded that the trial court erred in granting relief under Civ.R. 60(B)(5). We observed, however, that relief may be available to father under the (then) newly-codified R.C. 3119.961 and 3119.962, pursuant

32.

to which the legislature expressly made relief retroactive. We remanded the matter to the trial court for consideration of those statutes.

{¶ 68} Mother argues that *Guthrie* and *Poskarbiewicz* were, by their own language, limited to child support orders and are not applicable to actions challenging paternity filed by or on behalf of the child. She complains that Civ.R. 60(B)(2) forces a deadline on mother and child but not on legal fathers, thus genetic tests are improperly treated differently depending on the litigant. And she insists that under *Guthrie,* genetic tests are not "new evidence" for purposes of Civ.R. 60(B)(2), therefore, no more specific provision applies and relief may be granted under Civ.R. 60(B)(4) or (5). Mother's first assignment of error requires us to answer three questions:

(1) Are the holdings in *Guthrie* and *Poskarbiewicz* limited to child-support orders?

(2) Post-*Guthrie,* must genetic tests be considered under Civ.R. 60(B)(2)?

(3) If mother is correct that post-*Guthrie*, genetic tests are not "new evidence," may relief be granted under Civ.R. 60(B)(4) or (5)?

Mother's first assignment of error also raises a fourth issue—whether genetic tests are improperly treated differently depending on the litigant—but that issue is more appropriately organized under her second assignment of error.

{¶ 69} To answer the first question, we do not agree with mother that *Guthrie* and *Poskarbiewicz* were limited to child-support orders. *Guthrie*, in particular, is silent and does not suggest any intent by the Ohio Supreme Court to limit its holding to support orders.

33.

{¶ 70} As to the second question, we agree with mother that post-*Guthrie*, genetic tests are not "new evidence," thus Civ.R. 60(B)(2) does not apply. The Fourth District in *Dunkle v. Dunkle,* 135 Ohio App.3d 669, 678-79, 735 N.E.2d 469 (4th Dist.1999) considered this issue and reached the same conclusion. It emphasized that in *Guthrie,* genetic testing was available to father at the time of the initial finding of parentage, the results could have been discovered by due diligence in time to move for a new trial, therefore, the evidence was not "new evidence" under Civ.R. 60(B)(2). The *Dunkle* court held that the trial court erred when it relied upon Civ.R. 60(B)(2) to deny father relief from judgment. We agree with the *Dunkle* court's conclusion. *Guthrie* holds that Civ.R. 60(B)(2) does not apply to genetic tests available at the time of the initial finding of paternity.

{¶ 71} Having concluded that Ohio Supreme Court case law renders Civ.R. 60(B)(2) inapplicable, we turn to the third question—whether relief from judgment is possible under Civ.R. 60(B)(4) or (5). The trial court found that it was not because the more specific provision of (B)(2) applied. Since it does not, we consider the applicability of Civ.R. 60(B)(4) and (5).

{¶ 72} In *Guthrie*, the Ohio Supreme Court acknowledged the potential applicability of Civ.R. 60(B)(4) as a basis to seek relief from a judgment of paternity. But it explained that "it is no longer equitable" provision in Civ.R. 60(B)(4) "'was designed to provide relief to those who have been prospectively subjected to circumstances *which they had no opportunity to foresee or control*'"—it "was not meant

34.

to offer a party a means to negate a prior finding that the party could have reasonably prevented." (Emphasis in original.) *Guthrie* at 443, quoting *Knapp*, 24 Ohio St.3d 141, 493 N.E.2d 1353, at paragraph one of the syllabus.

{¶ 73} The *Dunkle* court elaborated on this discussion of Civ.R. 60(B)(4), particularly in the context of determining whether a movant filed his or his motion within a reasonable time, as required for both (B)(4) and (5). The court suggested that the best interests of the child should affect a trial court's determination of whether Civ.R. 60(B) motion was filed within reasonable time. *Id.* at 381, citing *Stevens v. Stevens*, Montgomery App. Nos. 11958, 12060, unreported, 1990 WL 116157 (Aug. 1, 1990) (Fain, J., concurring). It explained that "[w]hether a Civ.R. 60(B)(4) motion is timely depends in part on the nature of the relationship between the obligor and the child"—i.e., whether or not the father and child have a meaningful relationship and whether the child has come to rely upon the father for emotional and financial support. But we are particularly guided by the *Guthrie* court's emphasis on the party's ability to foresee or control the circumstances and whether the party could have reasonably prevented the judgment at issue.

In most of the Ohio case law on this subject, the action is filed by a man who has learned that he is not the biological father of a child he has supported. Many of those cases predate October 27, 2000—the effective date of R.C. 3113.2111 (later renumbered as R.C. 3119.961 and 3119.962). But two Ohio cases involving mothers who sought relief from judgment are helpful to our analysis.

35.

{¶ 74} In *Loveridge v. Loveridge*, 3d Dist. Hancock No. 5-10-37, 2011-Ohio-2611, for example, a mother sought relief under Civ.R. 60(B)(4) from a final judgment of paternity when the child was 16 years old. The court found that Civ.R. 60(B)(4) was not available to mother because she failed to make the motion within a reasonable time. In reaching this conclusion, it observed that given the nature of the situation, mother "*alone*" had been in the best position to know whether father was the child's biological father. (Emphasis in original.) *Id.* at ¶ 16.

{¶ 75} Similarly, in *Atchison*, 4th Dist. Scioto No. 00CA2727, 2001 WL 812804, mother sought relief under Civ.R. 60(B)(1), (4), and (5) from a judgment that found her child to be born of issue of mother's marriage to father. In affirming the denial of mother's motion, the court emphasized that mother knew before the lower court judgment that she had had sex with another man who could be the child's father and made the voluntary, deliberate choice not to raise the issue earlier. It held that she was not entitled to relief under (B)(1), (4), or (5).

{¶ 76} Here, mother knew that she had had sex with two men. The magistrate specifically did not find credible mother's testimony that she believed that biological father was sterile. Therefore, mother knew there were two men who could potentially have fathered E.B. She had the opportunity to foresee or control the circumstances here and could have reasonably prevented the acknowledgment of paternity from becoming final by ensuring the identity of the father before it was executed, seeking to rescind it within 60 days of its execution, or attempting to rescind it within one year after becoming

36.

final.  Her failure to do so bars *mother* from being granted relief under (B)(4).  And because it was mother who failed to reasonably prevent (or timely rescind) the judgment from which she seeks relief, we—like the *Atchison* court—find that relief *for mother* is not available under (B)(5).

{¶ 77} The problem with the present case, however, is that mother brought this action on behalf of E.B.  The trial court, without citation, found that mother's knowledge must be imputed to E.B. for purposes of (B)(4).  We disagree.  Ohio courts have found that "where a mother enters into agreement not to establish paternity with an alleged father pursuant to R.C. 3111.19, the child is not bound by the agreement and may subsequently bring a paternity action against the alleged father." *Fitzpatrick v. Fitzpatrick,* 126 Ohio App.3d 476, 482, 710 N.E.2d 778 (12th Dist.1998).  Moreover, "privity generally does not arise from the mere relationship of parent and child, especially when the interests of the parent and child are clearly different." *Id.* at 483.  *See also Snider v. Lillie,* 131 Ohio App.3d 444, 447, 722 N.E.2d 1036 (1st Dist.1997) (explaining that the right of a child to bring an action to establish paternity is separate and distinct from his or her mother's, "and a mother who agrees not to establish paternity cannot bind the child").  We believe it follows then that in circumstances such as those at issue in this case, a child will generally not be deemed to possess the same knowledge as his or her parents concerning the uncertainty of paternity.  And more importantly, we believe that where it is possible—perhaps even likely—that a mother's interest in setting aside a paternity judgment conflicts with a child's interest, a guardian ad litem must be appointed

37.

for the child. Fortunately, the record here reflects that a guardian ad litem was appointed after the hearing conducted before the magistrate. However, because there was no guardian ad litem appointed before the hearing, there was no testimony and no recommendations made by a guardian ad litem in connection with the Civ.R. 60(B) motion.

{¶ 78} In *Broxterman v. Broxterman*, 101 Ohio App.3d 661, 656 N.E.2d 394 (1st Dist.1995), the First District acknowledged that a child's interest in disestablishing paternity may diverge from those of his parent or guardian. It held that in such cases, a guardian ad litem must be appointed.

{¶ 79} In *Broxterman*, mother and father's divorce decree determined that the child was born of issue of his parents' marriage. Mother's parents eventually were granted permanent custody of the child. They filed a post-decree motion requesting a blood test to determine parentage; this motion was supported by an affidavit from mother averring that father was not the child's biological father. The trial court dismissed the action on the basis of res judicata and the custodians' lack of standing. On appeal, the First District court observed that it was unclear whether the custodians' brought the action only on their own behalf or whether they brought it on behalf of the child too. The court addressed the appeal both ways.

{¶ 80} The court began by finding that the custodians had stepped into the shoes of mother, who was originally granted custody and who was bound by the finding of

38.

paternity in the divorce decree. It held, therefore, that they were in privity with mother and barred by res judicata from relitigating this issue on their own behalf.

{¶ 81} But as to the child, the court began by observing that it is "generally held that the relationship of a parent and child does not automatically create privity[.]" *Id.* at 664. It commented that the child's interests " would seemingly coincide with those of his mother in the divorce action in part, namely on the issue of support, but may diverge on other issues, such as his right to know the identity of his biological father and his potential rights of inheritance from his biological father." *Id.* Given the potential conflict of interests, the court held that the child was not in privity with his parents in the divorce action and was not barred by res judicata from bringing a paternity action on his own behalf.

{¶ 82} The court then turned to the issue of standing, which it characterized as presenting two issues: (1) the custodians' legal capacity to bring this action on the child's behalf, and, if such capacity exists (2) the court's role in deciding whether they are doing so in the child's best interest. The court emphasized that "the paramount concern of the trial court must be the best interest of the child to ensure that the child is not being used as a pawn to further separate adult agendas." *Id.* at 665.

{¶ 83} Father argued that even if a paternity action was allowed, it could be brought only by a guardian ad litem. The court disagreed, observing that under R.C. 3111.04, an action may be brought by "the child or the child's personal representative." Additionally, it pointed out, Civ.R. 17(B) permits "a representative such as a guardian or

39.

other like fiduciary" to bring suit on a minor's behalf.   It held, therefore, that the child's legal custodians had legal standing to bring an action on his behalf.

{¶ 84} The father further argued, however, that in bringing this action, the custodians were acting only in their own self-interest—not the child's—and were seeking to undermine his relationship with his son.  The court observed that "[t]hese accusations raise[d] certain overriding, fundamental concerns that [could not] be ignored and must be addressed in the broader context of Ohio's parentage laws codified in R.C. Chapter 3111." *Id.*

{¶ 85} The court acknowledged that in adopting a form of the Uniform Parentage Act, the state has recognized the importance of a child knowing the identity of his or her biological father.  But, it emphasized, "there are other interests involved" that may differ in the context of a divorce versus a paternity action involving unmarried parents.  *Id.* Financial support of the child is one such interest.

{¶ 86} The court recognized that there are also social issues at play and questions that may arise from the possibility of stripping father of paternity over the child.  Some of those issues involve whether the child desires to continue to consider father as his father; whether the child is too young to understand the importance of the decision; whether the custodians are acting out of spite; and whether father has been emotionally and financially committed to the child.  The court acknowledged that establishing and maintaining the parent-child relationship "'is a particularly intricate, sensitive, and emotional process with which courts should be reluctant to interfere.'"  *Id.* at 666,

quoting *In re Galbraith,* 32 Ohio St.3d 127 131, 512 N.E.2d 956 (1987). Citing Justice

Herbert Brown's concurrence in *Hulett v. Hulett*, 45 Ohio St.3d 288, 295, 544 N.E.2d

257 (1989) (Brown, J., concurring), the court observed that "'[a] father-child relationship

encompasses more (and greater) consideration[s] than a determination of whose genes the

child carries. Sociological and psychological components should be considered.'" *Id.*

*See also Leguillon v. Leguillon*, 124 Ohio App.3d 757, 769, 707 N.E.2d 571 (12th

Dist.1998) ("[T]he Ohio Supreme Court has, for better or worse, rejected an

interpretation of parentage that would place the genetic relationship of the parties above

all other considerations.").

{¶ 87} Observing that the Ohio Parentage Act seeks to promote the child's best

interests and emphasizing that the child's best interest must be given primary

consideration, the court explained that while a child's custodian may have the legal right

to bring a paternity action on his behalf, such an action, in fact, may not be in the child's

best interest, "either economically, emotionally, or temporally." *Broxterman* at 667. To

protect against a custodian bringing an action that is potentially not in the child's best

interest, the court concluded that "'the right of an adult to bring a post-decree paternity

action on a child's behalf is not an absolute, unfettered right." *Id.* "Rather," it

determined, "the right of adults to bring such an action on the child's behalf is subject to

the overriding test of the best interest of the child." *Id.*

{¶ 88} The court held that "after a decree of divorce or dissolution has been

entered which includes an adjudication or agreement as to parentage and parental rights

41.

and obligations, a post-decree paternity action cannot be brought on a child's behalf absent an express determination by the court that such an action is in the best interest of the child." *Id.* Importantly, it found, "[t]o aid in making such a determination, the court should consider the appointment of a guardian ad litem." *Id.* It suggested that the trial court may also wish to appoint separate counsel for the child. The court remanded the matter to the trial court to determine whether a paternity action was in the child's best interest and instructed the court to consider (1) the relationship between father and child; (2) whether the biological father may be joined as a party; (3) whether the biological father has any interest in the child; (4) the question of support for the child; (5) the motives of the custodians for bringing the action; (6) the child's views; and (6) any other facts bearing on the child's best interest.

{¶ 89} Although the procedural posture of the present case differs from *Broxterman*, 101 Ohio App.3d 661, 656 N.E.2d 394, the concerns at issue are identical. Of paramount concern is E.B.'s best interest. Related to that concern is the extent to which mother's interest in seeking to vacate the acknowledgment of paternity conflicts with E.B.'s best interest. Clearly, mother wishes to sever ties with father. But even she conceded that father and child love one another, father regularly exercised visitation until mother interfered, and father and child have a bond. And while we conclude in this decision that post-*Guthrie*, Civ.R. 60(B)(4) and (5) are potentially available to the child as a mechanism to set aside the acknowledgment of paternity, it is essential that the court ensure that "the child is not being used as a pawn to further separate adult agendas."

42.

{¶ 90} We, therefore, hold, like *Broxterman,* that this matter must be remanded to the trial court. The trial court has already appointed a guardian ad litem in this matter in response to newly-filed pleadings in the case. The guardian ad litem shall make a recommendation and, after considering this recommendation, the court shall make an express determination whether pursuing the Civ.R. 60(B) motion is in E.B.'s best interest. If it is not, the motion shall be dismissed. If it is, the motion may go forward, with independent counsel for the child, and the trial court may proceed to consider whether the acknowledgment of paternity should be set aside under Civ.R. 60(B)(4) or (5). *See also Leguillon,* 124 Ohio App.3d at 767, 707 N.E.2d 571 (explaining that although res judicata may bar father from challenging parental relationship established by divorce decree, child may still bring challenge, but appointment of guardian ad litem should be considered to determine if challenge is in child's best interest).

{¶ 91} Accordingly, we find mother's first assignment of error well-taken.

## 2. Due Process and Equal Protection

{¶ 92} In her second assignment of error, mother reiterates that under *Guthrie,* genetic tests are not "newly-discovered evidence." She asks that this court "harmonize" any confusion and clarify that *Guthrie* permits consideration of genetic testing under Civ.R. 60(B)(4) and (5). She maintains that because the legislature (in R.C. 3119.961 and 3119.962) treats later-determined genetic tests as determinative for a father, it must also do so for the child. Mother emphasizes that these statutes place no time restrictions on the father. She insists that it violates due process and equal protection to treat

43.

identical evidence differently based on the litigant. And while mother acknowledges that she could have pursued genetic tests, her failure to do so should not be imputed to the child.

{¶ 93} As thoroughly explained in resolving mother's first assignment of error, we agree with mother that under *Guthrie*, the results of the genetic tests are not "newly-discovered" evidence and (B)(4) or (5) potentially provide the child a basis for relief from judgment. This conclusion obviates the need for us to specifically address mother's second assignment of error—including her constitutional challenges.

{¶ 94} Accordingly, we dismiss mother's second assignment of error.

### 3. Allegations of an Interdistrict Conflict

{¶ 95} In her third assignment of error, mother argues that the law of paternity has changed over the last 20 years and emphasizes that *Guthrie* and *Poskarbiewicz* were decided before R.C. 3119.961 and 3119.962 were enacted. Mother argues that in *West v. Reichman,* 5th Dist. Tuscarawas No. 2019 AP 10 0044, 2020-Ohio-1226, the court utilized Civ.R. 60(B)(5) in vacating a paternity finding, as did the court in *Dunkle v. Dunkle,* 135 Ohio App.3d 669, 735 N.E.2d 469. She submits that "[p]aternity should not be a variable depending upon where the child resides at the time the determination is sought."

{¶ 96} As thoroughly explained in resolving mother's first assignment of error, we agree with mother that under *Guthrie*, Civ.R. 60(B)(4) and (5) are potentially-available

44.

remedies depending on the circumstances of the case. This conclusion obviates the need for us to specifically address mother's third assignment of error.

{¶ 97} Accordingly, we dismiss mother's third assignment of error.

### 4. Policy Considerations Dictating a Different Interpretation of Civ.R. 60(B)

{¶ 98} In her fourth assignment of error, mother argues that because Civ.R. 60(B)(1) to (3) are unavailable, relief should be granted under (4) or (5). She reiterates that the child should not be penalized for mother's failure to take action within a year of the paternity judgment. Mother maintains that this is especially so given that "R.C. 3119.961 and 3119.962 grant a 'father' an unlimited right to challenge paternity at any time before the child attains the age of 23."

{¶ 99} As thoroughly explained in resolving mother's first assignment of error, we agree with mother that under *Guthrie*, Civ.R. 60(B)(4) and (5) are potentially-available remedies depending on the circumstances of the case. This conclusion obviates the need for us to specifically address mother's fourth assignment of error.

{¶ 100} Accordingly, we dismiss mother's fourth assignment of error.

### III. Conclusion

{¶ 101} We find mother's first assignment of error well-taken. We agree with mother that post-*Guthrie*, for purposes of a motion to set aside a judgment of paternity, results of genetic testing are not "newly-discovered" evidence, therefore, Civ.R. 60(B)(2) does not apply. While Civ.R. 60(B)(4) or (5) may be available in some cases, it is not

45.

available to mother here because she knew that she had had sex with two different men, either of whom could have been the child's father. As such, she could have reasonably prevented the judgment that she now seeks to vacate. However, because the motion was purportedly filed by the child, to whom mother's knowledge is not fairly imputed, child may be able to prevail on such a motion. But before the motion may proceed, the trial court must consider the recommendation of the guardian ad litem (who was appointed after the hearing on the Civ.R. 60(B) motion in response to newly-filed pleadings in the case) and determine whether it is in the child's best interest to seek to set aside the acknowledgment of paternity. If it is not, the motion shall be dismissed. If it is, the motion may go forward, with independent counsel for the child, and the trial court may proceed to consider whether the acknowledgment of paternity should be set aside under Civ.R. 60(B)(4) or (5).

{¶ 102} Our conclusion with respect to the first assignment of error obviates the need for us to consider mother's second, third, and fourth assignments of error, and we dismiss those assignments.

{¶ 103} We reverse the August 23, 2022 judgment of the Wood County Court of Common Pleas, Juvenile Division, and remand this matter for further proceedings as described in this conclusion. Mother and father are ordered to share the costs of this appeal under App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
                                          JUDGE

Myron C. Duhart, P.J.


_____
Charles E. Sulek, J.                      JUDGE
CONCUR.


_____
                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.